## ORDER

## F.R.C. v. K.M.C.

*Frank L. Caiola,* for plaintiff.
*Gary R. Block,* for defendant.

WOOD, *J.,* February 17, 1982 — In this custody case, we are called upon to decide what future living arrangements would best serve the interests and welfare of M.C., currently age eight, and L.C., currently age six, whose parents have divorced and are each remarried. L.C. and M.C. are presently living with their mother, K.M.C., in a three-bedroom apartment in a complex near Downingtown, Pa. Present with them are mother's new husband, A.T., and a new baby brother, J.T., who was recently born to A.T. and K.M.C. The apartment complex itself appears to offer a minimally adequate environment, and is located fairly near to the bus stop where L.C. and M.C. are picked up to be taken to St. Joseph's Catholic School.

L.C. and M.C.'s father F.R.C. lives with his new wife, P.C., and P.C.'s daughter by a previous marriage, D., in a single family detached dwelling at 19 Marshall Circle, Downingtown, Pa. Their home is located in a neighborhood of single-family homes, and there appear to be more children available to L.C. and M.C. in their father's neighborhood than there are in their mother's apartment complex. Since both parents live in the Downingtown area, a change in living arrangement would not necessitate a change in school.

M.C. is a personable pleasant youngster, currently in his regular grade at St. Joseph's School, who appears to have some learning disabilities, and is

barely working up to his grade level capabilities.[1] He appears to enjoy sports and both parents have involved themselves in various organized sporting activities in his behalf.

L.C. is a bright, pretty little girl, apparently with no learning drawbacks.

Both children expressed a mild preference to the psychologist for living with their father, but expressed no preference at all to the court. They appear equally attached to both parents.

K.M.C. appears to be a concerned mother. She has taken more interest in the children's schooling and proper placement in school than has F.R.C., although perhaps it is natural to expect the parent "in custody" to take the lead in that sort of thing. Although there is some evidence to indicate that her methods of disciplining and reprimanding the children are inappropriate (she sometimes yells or slaps), the children view her as a loving parent and not as a harridan. In comparison with F.R.C., her personal lifestyle appears to be looser or more laissez-faire, although she appears to have a consistent and well thought out philosophy of child raising. Her new husband, A.T., apparently shares her laissez-faire outlook, but appears to get along well with the children.

F.R.C., one would imagine, comes from a strict Catholic family background, because his view point of acceptable upbringing and conduct appears to be more rigid than K.M.C.'s although perhaps not unduly so. He pressed to have the children placed in a Catholic school because of the discipline they would

---

1. At a public school which he earlier attended, M.C. was in a learning disabled class. However, his father apparently kept insisting that the children go to Catholic school, and mother eventually gave in. She devotes two hours of her evening to helping M.C. with his studies.

receive, without particular reference to the specialized needs of M.C. His new wife P.C. and stepdaughter D. seem affectionate enough towards the children, and certainly M.C. and L.C. would suffer no environmental disadvantages were they to be transferred to F.R.C.'s primary custody.

The psychologist, Dr. Male, appeared to be about as perplexed as the court on the question of what to suggest here. It appeared to the court that he felt comfortable with seeing the children living with either family and hence suggested that they spend as much time with each as possible. All the testing done of the children and their own expressed statements, indicate that they do not draw any sharp divisions between either parent as far as their feelings of love and attachment are concerned.

The case of Jon M.W. v. Brenda K., Pa. Super., 420 A.2d 738 (1980), tells us that before we disturb a situation which is apparently working, we must be persuaded that there is a need to do so. In this case, as we have already told counsel, we think that the present custody situation is working well and we see no compelling reason to make a drastic change in it. On the other hand, if we were to view the situation anew, that is, if the children had not been living with either parent, then we might be inclined to prefer that they spend more time in father's home than in mother's. However, in the situation that exists, mother has been primarily responsible to date for raising the children and she is doing a better than adequate job and so, as an overall view point, we see no reason for changing the basic situation.[2]

---

2. We are mindful of the mandate of the appellate courts that we consider all the facts of a case and issue a comprehensive opinion discussing the situation from A to Z; see, e.g., discussion and cases cited in the article of "Family Law," 53 Pa.

We do, however, wish to go along with the psychologist to this extent: we think that more visitation with father should be encouraged. During the testimony, father mentioned that he had his weekends off and available for the children, so we think that the general pattern should be that the children would spend their weekends with their father, and their weekdays with mother, who is currently not employed outside the house.[3] However, we are mindful that a steady pattern of weekdays here, weekends there, gives both the children and the parents a distorted view of their relationship and of one another, and so we think it appropriate to mix in some weekdays with father and weekends with mother. Although there is nothing in the evidence addressed to this point, we are also of the belief that occasionally a child might like to have his or her parents to him or herself, and for that reason we

---

B.A.Q. 3, at 10. We have considered this from every relevant perspective that has occurred to us—preference of children, availability of adequate schooling, medical needs, financial resources of parties, home environment, recreation, parental care and guidance, and religious upbringing—and except as noted in our opinion, find little or no substantive difference between the parties in regard to any of the factors.

3. Just as we were about to issue our decision in this matter, we received a letter from father's attorney suggesting that mother now has a job requiring her to spend a very long day in Wilmington. At our request, mother's counsel informed the court, also by letter, that mother was indeed recently employed, but that the employment was temporary and expected to conclude on February 20, 1982. Since none of this information is technically in the record, we will not permit it to affect the order we are issuing today. However, we should note that we would consider the acquisition of permanent daily employment by mother, outside the home, as a circumstance which might, in a future proceeding, affect our thinking on the issues raised by this proceeding.

make provisions for special nights wherein one child goes to one parents' home and the other child to the other parents' home.

We should also make clear that what we are talking about here are living arrangements: in no way do we mean to imply that one parent has ownership or control of the children to the exclusion of the other, or that one parent is even the primary custodian. We specifically direct that both parents share the custody of these children, and by that we mean that they should consult with one another on the major decisions affecting the children's welfare. Of course, when a child is at a given parent's house, the rules of etiquette, discipline and day-to-day scheduling prevailing in that household will apply. But in matters of schooling, religious training, medical care and things of that sort, we direct that the parents consult with one another before making decisions in those areas which affect the children.

As we remarked at the close of the testimony, a lot of the problems apparent in this case could be resolved if the parents would lay aside their differences, at least as far as the children are concerned. If they would both agree to sublimate their personal feelings towards one another in the interest of their children, they would find that the children would not feel caught in perpetual warfare between their parents and that a lot of the anxieties that warfare produces will largely disappear.

Accordingly, we enter the following

## ORDER

And now, this February 17, 1982, we promulgate the following living schedule for M.C. and L.C.:

1. The children will continue to live primarily with their mother, but will spend three weekends a

month with their father. One weekend will run from after school on Friday until 6:00 p.m. Sunday evening. Another weekend will run from after school Friday until school time Tuesday morning. The third weekend will run from Thursday after school until 6:00 p.m. Sunday evening. The parties shall agree on which weekends shall be which, and if they can't agree, the court will set up a firm schedule.

2. The parties shall designate one weeknight a month where M.C. goes to his father's after school for dinner and sleeps over, while L.C. goes or stays with her mother, and one other night each month where L.C. goes to her father and M.C. goes to or stays with his mother.

3. The parties shall further abide by the rules attached to this order.

4. Holiday and vacation visitation shall be as heretofore.

## APPENDIX TO ORDER

Certain rules of conduct generally applicable to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for amendment of our order. If these general rules conflict with the specific requirements of our order, the order shall prevail.

### 1

Neither party will undertake nor permit in his or her presence the poisoning of the children's minds against the other party by conversation which ex-

plicitly or inferentially derides, ridicules, condemns, or in any manner derogates the other party.

## 2

The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

## 3

Neither party will question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of "spy."

## 4

Neither party will make extravagant promises to the minor children for the purposes of ingratiating himself or herself to the minor children at the expense of the other party, further, any reasonable promise to the children should be made with the full expectation of carrying it out.

## 5

The parties should at all times consider the child or children's best interests, and act accordingly. It is in a child's best interests to understand that he or she is trying desperately to cope with the fact of his parents' separation, and needs help in loving both parents, rather than interference or censure.

## 6

The parties should remember that they cannot teach their children proper moral conduct by in-

dulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

## 7

Weekend and evening visitation shall be subject to the following rules:

A. Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules.

B. Visitation rights should be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the needs and desires of the minor children.

C. If a party finds him or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

D. The party having custody of the children should prepare them both physically and mentally for the visitation with the other party and have them available at the time and place mutually agreed upon.

E. If either party or a child has plans which conflict with a scheduled visit and wish to adjust such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

F. If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

8

During the time that a child is living with a party, that party has the responsibility of imposing and enforcing the rules for day-to-day living. However, unless otherwise ordered, both parents should consult with one another on the major decisions affecting the children's lives, such as education, religious training, medical treatment, and so forth.